UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

- - - - - - - - - - -

UNITED STATES OF AMERICA,

                Plaintiff,                No. 1:24-CR-108

                vs.                    HON.  ROBERT J. JONKER
                                          U.S. DISTRICT JUDGE

KAUSHALKUMAR CHAUDHARY,

                Defendant.

_____/

## UNITED STATES' SENTENCING MEMORANDUM

### I.      INTRODUCTION

This Court will sentence Defendant, Kaushalkumar Chaudhary, on June 30, 2025.  The final presentence investigation report ("PSR") calculates a total offense level of 26 and a criminal history category of I, resulting in a range of imprisonment of 63-78 months.    For all the reasons set forth below, the United States contends that a sentence within the guideline range calculated by the Probation Officer is clearly appropriate in this case.

### II.      RELEVANT BACKGROUND/OFFENSE CONDUCT

The PSR more than adequately explains the offense conduct.  Defendant served as a "money mule" for a wide-reaching conspiracy, likely originating in India and other parts of the United States.  Defendant entered the country illegally in 2016.

(ECF 40, PSR, ¶61, PageID.130).  It is undisputed that he can read and write English.

(PSR, ¶67).[1]

Defendant's co-conspirators used a variety of schemes to reach mostly elderly victims throughout the United States.  Because of their advanced age and related vulnerability, the conspiracy convinced them that their bank accounts or social security account numbers had been compromised, that they were under state or federal criminal charges because someone committed identity theft, or a host of other shocking representations.  To close the deal, the co-conspirators convinced their victims that they were acting on behalf of a governmental agency, typically the FBI, FCC, IRS or some other entity.  The co-conspirators then convinced the victims to part with significant sums of money by delivery to "agents" who would pick up the money, nearly always on more than one occasion, so that the co-conspirators could clear up the compromised accounts or clear their names of criminal charges, and then return the money to a new account for the victim where it would be safe.

Defendant served as a money mule that picked up the money from the victims and moved it to other co-conspirators who likely wired the money to those originating the scheme.  Defendant received instructions on where the victims lived via text

---

[1]  Defendant does not dispute that he can read and write English but to assist the Court a series of chats from Defendant's phone in English with a female are attached as Exhibit 1 and show that he understands and communicates in English. Defendant's chats are in green.  Additionally, the PSR contains chats between a primary conspirator and Defendant where the conspirator directs Defendant to victim's homes in English, providing key information like house numbers, streets, cities, and passwords.  That would not have taken place if Defendant cannot effectively read English.

message to his cellular phone, along with descriptions of the victim or his/her home to assist in guiding Defendant to the proper location.  The government recovered that phone and examined it.   The phone showed that Defendant participated in a significant number of money mule trips.  In his plea agreement, Defendant agreed that at least 10 identified victims, in addition to the victim who was the focus of his indictment, would be counted as relevant conduct at sentencing.  The government also identified numerous other examples on the Defendant's phone showing that he received additional communications about victims and likely participated in many other trips to pick up fraud proceeds from their homes.  The sentencing loss amount is calculated only based on the victims the government specifically identified and that the Defendant agreed to as relevant conduct as part of his plea agreement. Additionally, even for those victims, the government only counted the amounts picked up by Defendant, and not the entire loss for those victims who had amounts picked up by other money mules.  In other words, the sentencing loss amount is extremely conservative and favorable to Defendant.

### III.    LEGAL ARGUMENT AND AUTHORITIES

**A.    The PSR Correctly Applied a 2-Point Enhancement Because the Conspiracy Represented that it was Acting on Behalf of a Governmental Entity**

The PSR recommends a 2-point enhancement under U.S.S.G. §2B1.1(b)(9) because "the offense involved (A) a misrepresentation that the defendant was acting on behalf of a charitable, educational, religious or political organization, or a governmental agency." (ECF 40, PSR, ¶38, PageID.40).  There is no dispute that the conspiracy included, as a central part of the scheme to defraud, misrepresentations

that individuals were acting on behalf of the FBI, Federal Communications Commission (FCC), and others. *See,* PSR, ¶7 and Victim Impact Statements attached to the PSR.[2]  Similarly, there is no evidence suggesting that Defendant personally made such statements directly to any of the victims of the conspiracy.   The question framed by Defendant's objection is whether he should be held responsible for the statements that his co-conspirators made to the victims for purposes of his sentencing guidelines.  Clearly, he should, in accordance with well-settled principles of relevant conduct under U.S.S.G. §1B1.3.

First, §1B1.3 provides that specific offense characteristics in Chapter 2 of the Guidelines "shall be determined on the basis of all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."    U.S.S.G.  §1B1.3(a)(1)(A).   Defendant aided and abetted his co-conspirators in defrauding the victims by making statements that they were working on behalf of a governmental agency.  By acting as a money mule, Defendant ensured that the goal of the scheme was accomplished.  Because money made it back to the principal fraudsters, they continued to defraud additional victims through any means necessary, including misrepresentations that they were acting on behalf of a governmental agency.  Defendant is clearly responsible for these statements, which originated with those individuals he was aiding and abetting in the fraud scheme.

---

[2]    The government attaches as Exhibit 2 an additional victim impact statement (victim B.W.) received after the filing of the Final Presentence Report.  This statement, like many others, describes statements by defendant's co-conspirators indicating that they were working for or with the government, in this instance, the Federal Trade Commission.

Second, Defendant should receive the enhancement because "in the case of a jointly undertaken criminal activity," Defendant's relevant conduct is determined by "all acts and omissions that were – (i) within the scope of the jointly undertaken activity; (ii) in furtherance of that criminal activity; and (iii) reasonably foreseeable in connection with the criminal activity."  §1B1.3(a)(1)(B).  There can be no serious dispute that the co-conspirators' statements that they were working for the FBI or other governmental agencies were in furtherance of the criminal activity and reasonably foreseeable in connection with that criminal activity.  The entire purpose of the conspiracy was to get vulnerable and elderly adults to part with their money by making them believe their money was in jeopardy.  What better way to accomplish this goal than to make the victims believe that the individuals coming to pick up their money were government actors there to protect them?  But were such statements within the scope of Defendant's jointly undertaken activity and reasonably foreseeable to him in connection with that activity?

In assessing the scope of a particular co-conspirators' agreement, the court should consider and evaluate: "(1) the existence of a single scheme; (2) similarities in modus operandi; (3) coordination of activities among schemers; (4) pooling of resources or profits; (5) knowledge of the scope of the scheme; and (6) length and degree of the defendant's participation in the scheme." *United States v. Donadeo,* 910 F.3d 886 (6th Cir. 2018) (citing and quoting *United States v. Salem,* 657 F.3d 560, 565 (7th Cir. 2011)).  The Sixth Circuit has not held that a district court must find that all or even most of the considerations listed in *Donadeo* apply. *See Donadeo*, 910 F.3d

at 898 (affirming district court where the majority but not all factors supported the decision); *United States v. Moody*, 787 F. App'x 857, 870 (6th Cir. 2019) ("*Donadeo* factors lend sufficient (though not unequivocal) support"). Nor has this Court counseled that the district court must accord the factors equal weight. *See Donadeo*, 910 F.3d at 895 fn.5 (approvingly listing prior cases that frequently "rel[ied] on" the existence of a single scheme, or on similarities in modus operandi, or on pooling of resources).

Here, Defendant knew, or it was foreseeable to him, that his co-conspirators were representing that they were working on behalf of governmental entities and that he was an agent picking up their money for safe keeping.  The investigation uncovered from Defendant's phone a video of at least one box containing gold that the Defendant admitted to picking up from victim M.R. in New York.  The victim, at the direction of Defendant's co-conspirators, addressed the box to the U.S. Department of Justice in Washington D.C.:



6

Defendant picked this package up from victim M.R. on or about July 12, 2023, and continued in the conspiracy until his arrest the following year, July 16, 2024. He certainly knew, or should have known, that his co-conspirators were likely telling victims that they were affiliated with government agencies. There is simply no credible explanation except that Defendant saw this package, read it, and knew that the victim must believe that government actors are involved.

The government also found what the Probation Officer describes as a "toy" law enforcement badge in Defendant's vehicle. (PSR, ¶30).



Although the badge may be a toy, in combination with all the facts, it is not a stretch to find that Defendant carried this badge because he knew the conspiracy was representing him to be a member of some governmental entity or law enforcement and intended to show it when needed. When authorities arrested Defendant, they also found him in possession of a driver's license and social security account number card in a different name. (PSR, ¶23, item h). Defendant clearly intended to be someone and something he truly is not. The combination of all these facts

7

demonstrates that he likely did know early in the year that he participated in the conspiracy that victims were likely to believe he was a government actor.

The additional *Donadeo* factors also weigh in favor of applying the enhancement to Defendant. The evidence shows coordination of multiple players involved in a single scheme. And the modus operandi is the same, although the exact nature of the fraudulent misrepresentations varied. Defendants pooled money, as evidenced by Defendant delivering the gold, silver and currency to other individuals and getting paid his share of the proceeds.

For all these reasons, this Court should uphold the application of the sentencing enhancement under §2B1.1(b)(9)(A), as recommended by the U.S. Probation Officer.

### B.    The Sentencing Factors – 18 U.S.C. § 3553(a)

This Court should sentence the Defendant to a term of imprisonment within the range specified by the guidelines, 63-78 months. The need for both specific and general deterrence clearly apply in this case. That Defendant remained in this country illegally and chose to participate in what was obviously a criminal enterprise points to the need to deter his future conduct and any attempt to return to this country to again commit crime. And just as importantly, general deterrence commands a guideline sentence so that the public is fully aware that stealing from elderly and vulnerable victims through wide-spread fraud over the internet and other means of communication will not be tolerated. As outlined in the PSR, defendant's victims were impacted by fraudulent conduct in an amount over $8,000,000.00.

8

Defendant is not being held responsible for this entire amount because the government does not have proof that others picking up proceeds from these same victims were linked to the same conspiracy as Defendant.  However, the magnitude of the losses to these victims from all fraudulent conduct, related or unrelated to Defendant, clearly shows the scope of fraud committed over the internet every day by individuals like Defendant and justifies a guideline sentence to deter others from heading down the same path.

Finally, a significant prison term is justified by the devastating effects that this crime had on the victims.  Not surprisingly, the victims reported that they were retired and on fixed incomes.  Defendant's critical participation in the conspiracy – moving money from the victims to the principal conspirators – fueled the financial destruction of the limited means of many of these victims.  Additionally, many described how Defendant's conduct destroyed their confidence and trust in anyone, including government officials. In a day and age where participation in society requires the use of the internet, social media and many other platforms that strain our ability to tell what is real and what is fraud, Defendant's actions in betraying the confidence of the elderly victims, many who struggle to adapt to new technologies, has severely damaged their ability to participate in society going forward.  And when they do need to turn to the government for help, they will now hesitate to do so because what they believed were government agents helping them through difficult situations before turned out to be nothing but one of many lies told to get them to part with their money.

9

## IV.    CONCLUSION

For all these reasons, the United States respectfully requests that this Court uphold the guideline scoring of the Probation Officer and sentence Defendant to a term of imprisonment within the applicable guideline range.

Respectfully submitted,

ALEXIS M. SANFORD
Acting United States Attorney

Date: June 16, 2025

/s/ Ronald M. Stella
RONALD M. STELLA
Assistant United States Attorney
P.O. Box 208
Grand Rapids, Michigan 49501-0208
(616) 456-2404